**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>CONVENTION CENTER PARKING, INC.<br><br>    Debtor. | CASE NO. 24-04516 MAG11<br><br>Chapter 11<br><br><br>FILED & ENTERED ON 3/28/2025 |

### OPINION AND ORDER

This case is before the court on a Motion for Relief from Stay under 11 U.S.C. 362 § (d)(2) filed by WM Capital Partners 53, LLC ("WM Capital") on February 3, 2025. Dkt. #41. Convention Center Parking, Inc. ("Debtor") filed an opposition to the motion for relief from stay on February 21, 2025. Dkt. # 49. On February 25, 2025, the court held a preliminary hearing on the Motion for Relief from Stay filed by WM Capital in the related case of Full House Development, Inc., Case No. 24-04515. During that preliminary hearing, the court scheduled an in-person final hearing for March 20, 2025, and consolidated the final hearing in the instant case with the final hearing in the case of Full House Development, Inc. The court stated at the preliminary hearing that it would hear evidence on whether Debtor has equity in the property subject to the Motion for Relief from Stay and whether that property is necessary for an effective reorganization pursuant to 11 U.S.C. § 362(d)(2).  After careful consideration of the evidence presented, and for the reasons stated below, this court grants the Motion for Relief from Stay in favor of WM Capital.

### I.    JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), L. Civ. R. 83K(a), and the General Order of Referral of Title 11 Proceedings

to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. PROCEDURAL BACKGROUND

On October 21, 2024, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Dkt. # 1. Debtor filed its bankruptcy petition at the same time as two other related entities: Full House Development, Inc., ("Full House") Case No. 24-04515 and Golden Triangle Realty S.E., ("Golden Triangle") Case No. 24-04514. In the instant case, only three creditors have filed proofs of claim, to wit, the Puerto Rico Department of Treasury, in the amount $6,935.90, the Internal Revenue Service in the amount of $17,688.12, and WM Capital, in the original amount of $57,591,876.70 amended on March 19, 2025, to $49,246,225.10. Claims Register ## 1-1, 2-1, 3-1, 3-2. All creditors were listed in the Schedules as disputed or unliquidated except DAD Developers & Contractors, Inc. which was listed with an unsecured claim in the amount of $7,200,000. Dkt. # 19, pp. 14-17. At the final hearing on the Motion for Relief from Stay, Debtor stated that this creditor was an insider.

WM Capital's claim is cross-collateralized with the real properties in all three related debtor entities, thus the same claim was filed in each of the three cases.

As of this date, the disclosure statement and plan of reorganization have not been filed.

### A. WM Capital's Motion for Relief from Stay

According to WM Capital's Motion for Relief from Stay, the perfection of its secured interest dates to September 24, 2004, when VSJ Realty, S.E. executed a Mortgage Note in the amount of $12,500,000 (the "First Mortgage Note"). The First Mortgage Note is secured by property number 20,695, recorded in the Registry of Property of Puerto Rico, First Section of San Juan, at page 101 of volume 332 of Santurce Sur, ("Parcel A"), described as follows:

2

"URBANA: Propiedad Horizontal: Number One (1), located in the Vistas de San Juan Condominium, which in turn is located at number six hundred (600) of Fernández Juncos Avenue, in the "Tras Miramar" sector of the Santurce Ward, in the municipality of San Juan, Puerto Rico, with a total private area of approximately two hundred thirty-two thousand one hundred seven square feet (232,107 sq.ft.) equivalent to approximately twenty one thousand five hundred sixty three point two six six square meters (21,563.266 sq.mt.). This apartment unit consists of a rectangular main building consisting of two hundred thirty-two thousand one hundred seven square feet (232,107 sqft.), equivalent to twenty-one thousand five hundred sixty-three point two, six square meters (21,563.266 sq. mt.) The main building of eleven (11) floor levels above this apartment unit consists of a ground floor level, a first-floor level and it (that includes the penthouse level), with a total of three hundred sixteen (316) residential dwelling spaces, spread throughout the apartment, all of which, collectively and the commercial, recreational, office, storage, and maintenance area comprise the Residential Apartment Unit. Its boundaries, access and description are as follows. By the NORTH, in various distances totaling two hundred ninety four feet six inches (294' 6") , with an exterior wall of the building that separates it from a common yard and the egress access ramp that separates it from lands belonging to the United States Navy and to the Government of Puerto Rico; by the SOUTH, at the first floor level in a distance of one hundred three feet six inches (103' 6"), with apartment number two the "First Floor Commercial Apartment Unit") of the Vistas De San Juan Condominium, and at all other floor levels of the main structure with an exterior wall that separates it from a common yard and the ingress access ramp that is connected to this Apartment at the southwestern end of the main structure; by the EAST, in a distance of Fifty four feet (54'), with an exterior wall that separates it from Caribbean Sea View Condominium; and by the WEST, at the first floor level, in a distance of seventy one feet (71') with Apartment Number Two (the "First Floor Commercial Apartment Unit"), and at the all other floor levels, in a distance of two hundred ninety four feet six inches (294' 6") with an exterior wall that separates it from a common yard facing Villa Verde Street. The roof and floor slabs of Apartment Number Two (the "First Floor Commercial Apartment Unit") are common to this Apartment's roof slab at the Southeastern most level of the second floor respectively. The ground floor level is divided, at the ground level only, into two interconnected areas by a paved driveway, which is a common area, but continues connected by the roof slab over the paved driveway, which roof, in turn, serves as part of the floor slab for the Apartment's first level. This Apartment owns an undivided share of the common elements of the Building Complex equivalent to sixty-five point Thirty One percent (65.318%)."

On May 11, 2006, VSJ Realty, S.E. executed a Mortgage Note (the "Second Mortgage Note") in the amount of $3,300,000.  The Second Mortgage Note is secured by Parcel A. On September 1, 2006, Golden Triangle executed a Mortgage Note (the "Third Mortgage Note") in the amount of

$16,000,000. The Third Mortgage Note is secured by Parcel A.  On June 22, 2007, Golden

Triangle executed a Mortgage Note ("Fourth Mortgage Note") in the amount of $3,420,000. The

Fourth Mortgage Note is secured by Parcel A.  On January 24, 2008, Debtor executed a

Mortgage Note ("Fifth Mortgage Note") in the amount of $980,000.

On January 24, 2008, Debtor and Golden Triangle executed Deed of Segregation, Sale

and Mortgage ("Deed of Segregation") whereby Golden Triangle, as owner of the real property,

segregated from Parcel A a parcel of land, property number 22,114, recorded in the Registry of

Property of Puerto Rico, First Section of San Juan, at page 193 of volume 401 of Santurce Sur

("Parcel B") (referred to as the "Property") described as follows:

> "**URBAN**: Parcel of land located in the Tras Miramar Southern Section of the
> Ward, of Santurce of the Municipality of San Juan, Puerto Rico, with an area of
> three thousand one hundred fifty nine square meters and eight thousand nine
> hundred seventy one of another (3,159.8971 sq. mt.), equivalent to twenty seven
> hundredth of a cuerda (0.8040 cuerdas). bounded on the NORTH, with land
> belonging to Condominium Vistas de San Juan from where it is segregated, in
> three (3) alignment as follows: two (2) meters and sixty eight (68) hundredth of
> another; 44 meters and 53 hundredth of another and 6 meters and 65 of another on
> the SOUTH, with the property belonging to Transportation and Public Work
> Department Inc., in four (4) alignments as follows: ten (10) meters, forty seven
> meters and ninety four (94) hundredth of another, and ten (10) meters and thirty
> three (33) hundredth of another; on the EAST, with land belonging to
> Condominium Vistas de San Juan from which it is segregated, in four (4)
> alignments as follows: three (3) meters and fourteen (14) hundredth of another;
> four (4) meters and nine eight (98) hundredth of another; three (3) meters, and
> twenty (20) meters and ninety four (94) hundredth of another, and with land
> belonging to Succession Miguel Fernandez in one (1) alignment as follows: forty
> six (46) meters and fifty one (51) hundredth of another; and on the WEST, with
> land property of the Transportation and Public Work Department, in three (a)
> alignment as follows: twenty six (26) meters and seventeen (17) hundredth of
> another fifty (50) meters and four (4) hundredth of another, and seven (7) meters
> and seventy four (74) hundredth of another."

Golden Triangle sold Parcel B to Debtor, pursuant to the Deed of Segregation. To secure

the obligations under Mortgage Note V, Debtor, as owner of the real property, constituted a

4

mortgage over Parcel B, pursuant to the Deed of Segregation. Therefore, Parcel B is encumbered, by its origin, by the mortgages that guarantee Mortgage Note I, Mortgage Note II, Mortgage Note III and Mortgage Note IV, and by itself, by the mortgage that guarantees Mortgage Note V. The amount of the mortgage credit constituted and created over Parcel B to secure the payment of Mortgage Note V is $980,000.00. The amount of the mortgage credit constituted and created over Parcel B to secure the payment of Mortgage Note I, Mortgage Note II, Mortgage Note III and Mortgage Note IV is $250,000.00 per mortgage.

On July 31, 2008, Debtor executed an Unconditional Guaranty of Payment and Performance in favor of R-G Premier Bank of Puerto Rico (WM Capital's predecessor), whereby Debtor, as guarantor, agreed to make all payments and perform the obligations of Golden Triangle. On September 1, 2022, the Court of First Instance of Puerto Rico, Superior Court of San Juan, issued an Amended Judgment in favor of WM Capital, and against, among others, Golden Triangle and Debtor, in the amount of $23,569,530.00 for principal and $17,435,913.85 for interest calculated as of April 9, 2021, which continue accruing daily, at a rate of $3,067.24 as agreed, until the total payment of the debt, plus the amounts agreed to in certain mortgages and the advances allowed by these for $59,793.65, plus $4,224,248.00 for costs, expenses, and attorney's fees. The State Court Judgment also authorized the sale in public action of, among others, the Property.

WM Capital argues that the lifting of the stay is warranted under 11 U.S.C. § 362(d)(2) because Debtor has no equity in the Property, and the Property is not necessary for an effective reorganization. "[U]nless the debtor can demonstrate that the property is necessary to an effective reorganization, the property is of no value to the debtor or to the estate and relief should be granted so that the party with a real interest in the property can control its disposition." 3 Alan

N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 362.07 [4][a] (16th ed. 2025). Here, Debtor bears the burden of showing "that the property is essential for an effective reorganization that is in prospect." United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375–76 (1988).

WM Capital asserts that Debtor holds no equity on its real estate, nor does it own any assets which could help it raise operating capital. According to WM Capital, Debtor has also admitted that it has no source of income, and there is no indication in the docket that the Property has any realistic prospect of generating income. Under these facts, WM Capital alleges that Debtor cannot prove it has a reasonable possibility of an effective reorganization. Moreover, given that WM Capital is basically the only secured creditor (besides CRIM, which is listed as secured with an unknown amount), and practically the only non-insider unsecured creditor (besides governmental entities) in this case, as well as being well undersecured, it will be entitled to vote under its secured and unsecured portion of its debt with respect to any potential plan of reorganization that may be filed by Debtor. Without WM Capital's support, it is highly unlikely that Debtor can confirm a plan. This is because WM Capital would control the entire portion of the secured class of any prospective plan, as well as the unsecured class considering the amount of WM Capital's deficiency claim. On the other hand, any proposed reorganization plan that may be filed by Debtor would not be confirmable under 11 U.S.C. §§ 1129(a)(11) and 1129(b)(2) of the Code if WM Capital were to make a 11 U.S.C. § 1111(b) election to treat its debt as fully secured, as Debtor does not have the financial capacity to make the required payments under this scenario.

**B. Debtor's Opposition to the Motion for Relief from Stay**

In its opposition to the relief from stay, Debtor argues that in determining the existence of cause for relief from stay courts must apply a balancing test. The test has been referred to as the "balance-of-the-hurt-test", under which the interests of the estate are weighed against the hardships that will be incurred by the movant. In Re: San Clemente Estates, 5 B.R. 605, 611 (Bankr. S.D. Cal. 1980). In certain instances, courts may find that an action pending in another tribunal will interfere with the pendency of the bankruptcy case and the automatic stay provisions. Such is the situation in this case according to Debtor. Even more so, when WM Capital already has a judgment and as such the only pending remedy in the local court is a sale at a public auction on a piecemeal basis. According to Debtor, to sell Debtor's realty on its own would be detrimental to the bankruptcy estate.

Debtor further contends that pursuant to 11 U.S.C. § 362(d)(2), WM Capital must prove that the subject properties are not necessary for an effective reorganization. The subject properties are part of a major project that must be administered jointly to maximize their return to the benefit of all creditors, particularly WM Capital. Debtor's Property and those of related debtor corporations Golden Triangle and Full House must be sold together because they are part of a major project. In fact, the properties of all three debtors were initially owned by the same owner. Debtor attached copies of deeds showing how they were originally owned by Gran Bahia Investment Group, Inc. and subsequently segregated and transferred to Debtor, Golden Triangle and Full House. Debtor underscores that all the attached deeds establish that all the parking spaces (the multi-level garage now owned by Debtor and the lot now owned by Full House) have a restrictive covenant forcing them to provide them all as parking spaces for the benefit of the apartments owned by Golden Triangle.

Debtor included as Exhibit G the plans and renderings of the bigger project, which includes all the realties owned by the three corporations in bankruptcy and prospective construction of two additional hotels in the realty now owned by Debtor. Debtor also attached as Exhibit H a letter (dated February 9, 2009) from the Tourism Company of Puerto Rico endorsing the project. Debtor argues that WM Capital has failed to take into consideration the value of the realties as a whole and has provided no evidence whatsoever of their value. WM Capital is simply relying in the amount listed by Debtor in the schedules, which does not consider the value of all the realties combined and the future project. Debtor states that WM Capital has not provided any appraisal for the subject properties and as such it cannot be determined if there is any equity cushion, which would trump any request for adequate protection. Any decision regarding the value of the realties would be premature without a proper appraisal.

In sum, Debtor contends that the lifting of the stay will prejudice the bankruptcy estate and creditors.

## C. The Preliminary Hearing

On February 25, 2025, the court held the preliminary hearing on the Motion for Relief from Stay in the case of Full House. WM Capital argued for the lifting of the stay pursuant to 11 U.S.C. § 362(d)(2), that is, Debtor's lack of equity in Full House's property, and that such property is not necessary to an effective reorganization. WM Capital stated that it has the burden of proof on the issue of Debtor's equity in the property and Full House has the burden of proof on all other issues including that its property is necessary for an effective reorganization. 11 U.S.C. § 362(g).

At the hearing, WM Capital argued that as to establishing the value of its collateral it has relied on the value given by Full House in its schedules which is $700,000 and as such Full House has no equity in its property as per Debtor's admission. WM Capital repeated its arguments

espoused in its Motion for Relief from Stay that the property is not necessary for an effective reorganization because as Full House's largest creditor Full House will not be able to confirm a plan of reorganization without its support and attempts at negotiating with Full House have proven fruitless.

In turn, Debtor argued that WM Capital must submit evidence of the value of the property and cannot rely on the information in the schedules to satisfy its burden under 11 U.S.C. § 362(g). Full House further argued that it is engaging in conversations with entities that are interested in purchasing the project but must await the appraisal to be conducted by the estate's appraiser to know the potential purchase price. It received communications from an entity that expressed interest to negotiate with WM Capital to purchase the claim. WM Capital stated that it received an offer of $18,000,000 for its claim but such offer had been rejected.

Considering the evidentiary issues involved, the court scheduled an in-person final hearing to hear evidence on whether Full House has equity in its property and on whether the property is necessary for an effective reorganization pursuant to 11 U.S.C. § 362(d)(2). The parties noted that in the instant case of Convention Center, Case No. 24-04516, there was a preliminary hearing scheduled for March 4, 2025, to consider WM Capital's motion for relief from stay and that the evidentiary issues herein are the same as in the case of Full House. Therefore, WM Capital consented to the consolidation of the preliminary hearing in this case with the final hearing scheduled for March 20, 2025, at 10:00 a.m.

WM Capital also informed that it would file a motion for relief from stay in the case of Golden Triangle, case no. 24-04514, and also consented to the consolidation of the preliminary hearing to be scheduled in such case with the final hearing scheduled for March 20, 2025, at 10:00 a.m. However, the motion for relief from stay in the case of Golden Triangle was filed on March

9

5, 2025. (Case no. 24-04514, Dkt # 47). Due to the lateness in the filing of the motion for relief from stay in the case of Golden Triangle, the final hearing in that case could not be heard on March 20, 2025, with the motions filed in the other two related cases. The preliminary hearing in that case is scheduled for April 1, 2025.

The stay remained in full force and effect pending a final determination.

## D. The Final Hearing

On February 26, 2025, the court entered the order setting the evidentiary hearing for March 20, 2024, in which the parties were ordered to file a joint report on or before March 13, 2025. Dkt. # 52. The joint pre-trial report was filed the day before the final hearing, that is, on March 19, 2025. In the joint pre-trial report the parties failed to include any exhibits to be presented at the evidentiary hearing, including the appraisal reports for both sides, in contravention with the order setting evidentiary hearing which specifically provides that the pre-trial report must include: "Copy of exhibits and/or identification duly marked in the sequence proposed to be offered at the evidentiary hearing by each party. Movant's exhibits must be marked alphabetically (A-Z) and Debtor's exhibits must be marked numerically (1-100)." Dkt. ## 69, 52 at p. 2.

At the outset of the hearing, the court stated that the motions for relief from stay filed in the two cases scheduled to be heard involve a lot of land and a parking. WM Capital had the burden to prove lack of equity and Debtor had the burden to prove that the property is necessary for an effective reorganization. As to the last prong the court stated that it needs to look at the feasibility of a plan of reorganization, not only the value of the assets for each case.

Both parties agreed that the value of the Property is below the amount of WM Capital's claim therefore the burden to prove that the Property lacks equity was met.

10

Debtor proceeded to meet its burden to show that the Property is necessary for an effective reorganization. Debtor argued that even though the Property lacks equity when considered separately the court must consider it as part of a project which involves the properties of the three related debtor entities: Golden Triangle Realty S.E. Case No. 24-04514, Full House Development Inc. Case No. 24-04515 and Convention Center Parking, Inc. Case No. 24-04516.[1] Debtor contends that properties of the three related entities are part of the reorganization of the three cases.  The Property in the instant case is designated as parking space for the apartment building of Golden Triangle and parking is essential for the sale of the apartments. In essence, Debtor contends that by separating the properties and potentially relinquishing control of the parking spaces, its chances of a successful reorganization are significantly diminished. Debtor explained that the Golden Triangle apartments' deeds include two parking spaces with perpetual easements recorded in the Property Registry, designated exclusively for them. The availability of parking is critical for the prospective sale of the residential apartments which is key to attaining confirmation in this case, therefore Debtor argued that the administration of all properties must be done jointly. Debtor asserts that it will propose a joint plan of reorganization in all three cases paying WM Capital in full plus interest in a one-to-three-year span.

WM Capital stated that they will not support any plan of reorganization proposed by Debtor, no payment on their claim has been made in the last ten years and the easements referred to by Debtor protect the Golden Triangle apartments regardless of who the owner is.

Debtor argued that because the plan of reorganization will pay WM Capital in full plus interest, they will be unimpaired and as such will not have the right to vote on the plan.

---

[1] The court notes that on March 19, 2025, it entered an order denying Debtor's request for substantive consolidation of the three cases. Dkt. # 70.

Debtor called two witnesses to the stand: Mr. Jose L. Pacheco Carrasquillo and Dr. David Santiago.

Mr. Jose L. Pacheco Carrasquillo, real estate appraiser, was qualified as an expert witness. Mr. Pacheco testified that he was hired to conduct an appraisal of the properties involved in this case: 205 units in the Vistas del Mar Condominium, 25 commercial spaces, the Debtor's parking building, and the vacant lot owned by Full House. He explained that after visiting the properties and meeting with Debtor's president, he analyzed comparable sales to arrive at a value conclusion. A document titled Appraisal Report prepared by Mr. Pacheco was admitted as Debtor's Exhibit 1. Mr. Pacheco clarified that due to the limited time available to prepare the appraisal report, he had created a letter of value for this hearing but stated that he had gathered all necessary information to conduct a full appraisal for the four collateral components. Mr. Pacheco explained that Debtor's Exhibit 1 is not an appraisal report, it is a letter of value which advances the values of the real properties in all three related cases. The supporting documents are held and available in his office. The values of the properties of the three related debtors as listed on page 3 of Debtor's Exhibit 1 are:

Golden Triangle Realty SE

$41,000,000 aggregate retail value of "as is" 205 apartments

$8,300,000 aggregate retail values of "as is" 25 commercial locales

Convention Center Parking, Inc.

$2,900,000 market value of the 290-stall, parking building

Full House Development, Inc.

$2,350,000 market value of 3,361.95 square meter remnant vacant sites

For a total amount of $54,550,000

To establish the market value of the residential apartments Mr. Pacheco explained that he analyzed comparable sales from the past two years; however, he admitted that the comparable sales analysis and its supporting documents were not included in the letter of value due to the limited time available for preparing the report. During cross-examination, he acknowledged that he had not conducted an analysis to determine the impact that losing the raw land and parking would have on Golden Triangle.

Debtor then called Dr. David Santiago, president of Debtor, Full House and administrator of Golden Triangle, to the stand, who testified as to the process of obtaining and developing the properties of all three related entities. He explained that RG Premiere Bank lent him $38 million, securing the loan with all properties owned by Full House, Convention Center, and Golden Triangle. This funding was intended for a master project that would include residential and tourist apartments, as well as commercial spaces with exclusive parking.

Dr. Santiago explained that the three debtors filed for bankruptcy to pay all their creditors by either negotiating an agreement with WM Capital, obtaining third-party financing, or selling the apartments. He stated that he currently has a list of 29 potential buyers for the apartments and estimates that the Golden Triangle apartments could be fully sold within three years, allowing creditors to receive full payment on their claims. No letter of credit or list of potential purchasers was provided. Finally, Dr. Santiago opined that the "as is" value provided by Mr. Pacheco of $54 million is quite conservative. Debtor' Exhibit 2 is a sales contract of an apartment located in the Golden Triangle apartment building. The sales price was $202,000 and the contract is dated January 17, 2009. No other sales contracts were submitted.

Dr. Santiago also testified about the critical importance of parking spaces, explaining that losing these would cause irreparable harm to the current residents and future purchasers of the

13

apartments. He mentioned that WM Capital rejected a $25 million offer to purchase the entire project. No documentary evidence of this offer was submitted but Debtor submitted title search reports for the properties, which were admitted as Debtor's Exhibit No. 3-6, to demonstrate the perpetual parking easements encumbering the properties of Debtor and Full House.

During cross examination, Dr. Santiago stated that the October 2024 offer to pay WM Capital $25 million for their claim was a reasonable offer. He agreed that no payment have been made to WM Capital in the last ten years explaining that he had prevailed in litigation arguing that this was a litigious credit, but in the end, the Supreme Court of Puerto Rico reversed the lower courts' decisions. Dr. Santiago did not state when the Supreme Court of Puerto Rico issued their decision, but the only joint exhibit admitted into evidence is the judgment in favor of WM Capital entered by the Superior Court of Puerto Rico in the collection of monies and foreclosure of mortgage action against Debtor which was entered on August 29, 2022.  Such judgment is attached to WM Capital's proof of claim and serves as a basis thereof.  Dr. Santiago also stated that WM Capital did not allow the release of the mortgage proportionately upon the sale of the apartments and that is why no apartments were sold in the last ten years. No evidence was presented to corroborate or expand on this statement.

Finally, Dr. Santiago talked about a monthly income of $7,200 from Liberty for the lease of antennas in the Golden Triangle building, channeled to Golden Triangle through a third party to protect the monies from collection efforts of WM Capital.

As a rebuttal witness WM Capital presented Mr. Juan Jose Jimenez, real estate appraiser, who was qualified as an expert. Mr. Jimenez stated that Mr. Pacheco's letter of value does not meet the minimum requirements for an appraisal report under the Uniform Standards of Professional Appraisal Practice (USPAP). He explained that the letter of value lacks the

underlying documents and analyses necessary to support a credible valuation conclusion. Furthermore, he highlighted the distinction between aggregate retail value and market value, noting that all relevant costs—including administrative expenses, maintenance, depreciation, insurance, and homeowners' association fees—must be considered for accurate valuation.

Mr. Jimenez indicated that he inspected the properties on March 7, 2025, and prepared two appraisal reports: one for the properties involved in the final hearing (Full House's vacant lot and Debtor's parking garage) and another for the apartment units owned by Golden Triangle, which include 25 commercial units in the Golden Triangle condominium and 207[2] residential units in the Vistas de San Juan condominium. This last appraisal report was admitted as WM Capital's Exhibit A where Mr. Jimenez concludes that "the market value of the subject group of units, in their "as is" condition, subject to the extraordinary assumptions listed in the report as of March 7, 2025, and as "bulk sale" transaction, was: $20,000,000". WM Capital's Exhibit A, p. 2.

Mr. Jimenez stated that at his March 7, 2025, inspection he saw that some of the 207 apartments that were being appraised were in different conditions; some were in good condition, others needed substantial repairs while some others were a "shell", as he described them. He noted that the common areas were deteriorated.

Mr. Jimenez also acknowledged that his appraisal report was based on a "bulk sale transaction" to a specific individual, which is typically discounted due to the associated risks. When asked whether the value of the units would be higher if sold individually to different purchasers, he agreed that there is a high demand in Puerto Rico for residential units priced around $200,000 and conceded that it is reasonable to believe the apartments could be sold at that price

---

[2] Debtor's Exhibit 1 provides that Golden Triangle owns 205 residential apartments while WM Capital's Exhibit A states that there are 207 residential apartments. This court is unclear as to which is the correct number of residential apartments. The difference is immaterial for purposes of this opinion's conclusion.

range. However, he explained that to perform a subdivision analysis, the value of the total sales of the individual units would need to be discounted by subtracting every component and considering the timeframe for these sales. Regarding the perpetual easements, he admitted that they do not specify how much the owner of an apartment unit would be charged for parking use.

Mr. Jimenez elaborated on the necessary discounts to determine a potential aggregate value for individual sales of the apartment units. He cited factors such as broker commissions, legal fees for sales, investment in the reconditioning of units in poor, fair, or "shell" condition, and holding costs like payroll, maintenance, and homeowners' association fees. When questioned by the court, he stated that he did not know how many of the apartments are in "shell" condition or deemed uninhabitable. Mr. Jimenez acknowledged that it is possible to estimate the discounts associated with the potential aggregate value of the individual sales of the apartment units, but he admitted that he did not know whether such estimates had been made.

WM Capital proffered the testimony of its authorized representative Mr. Jim Barr Coleman, who was present at the hearing, that would have established that WM Capital would not support any reorganization plan presented by Debtor. Debtor stated that it did not need Mr. Coleman to take the stand to testify.

## III.    APPLICABLE LAW AND DISCUSSION

The Bankruptcy Code in its section 362(d)(2) provides that the court shall grant relief from the automatic stay:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay provided under subsection (a) of this section
> . . .
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if-
> > > (A) the debtor does not have an equity in such property; and
> > > (B) such property is not necessary for an effective reorganization.

11 U.S.C. § 362(d)(2)(A), (B). The moving party has the burden of proof on the issue of the debtor's equity in the property, and the opposing party has the burden of proof on other issues. 11 U.S.C. § 362(g).

As stated at the final hearing, this court finds that for purposes of 11 U.S.C. § 362 (d)(2)(A) the plain language of the statute mandates that the court only consider the value of Debtor's property that serves as collateral and not consider all the collateral available to the secured creditor. See, In re SW Bos. Hotel Venture LLC, 449 B.R. 156, 177 (Bankr. D. Mass. 2011). However, as stated at the hearing, for purposes of 11 U.S.C. § 362 (d)(2)(B), the court will consider other collateral available to the creditor in evaluating whether the property is necessary for the effective reorganization. Id.

The parties consented that Debtor lacked equity in the Property as the amount of WM Capital's claim far surpasses the value of the Property. As stated, WM Capital's proof of claim is in the amount of $49,246,225 while Debtor's expert witness testified that the value of the Property approximates $2,900,000.

### A. 11 U.S.C. § 362(d)(2)(B)

The statute provides that with respect to the stay of an act against the property of debtor, debtor must establish that such property is necessary for an effective reorganization. It is not hard to establish that the property is necessary to reorganize, as is the case here, what is most difficult is to establish that there will, in fact be, an effective reorganization. With respect to what is an effective reorganization for purposes of 11 U.S.C. § 362(d)(2)(B), the Supreme Court has pronounced that "[w]hat this requires is not merely a showing that there is conceivably to be an effective reorganization that is in prospect … this means that there must be "a reasonable

17

possibility of a successful reorganization **within a reasonable time**." United Sav. Ass'n of Tex

v. Timbers, 484 U.S. at 375-76 (emphasis ours).

> The cases are numerous in which 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, even within that period lack of any realistic prospect of effective reorganization will require 362(d)(2) relief.

Id. at 376. To analyze whether there is a realistic chance that there will be an effective

reorganization courts look at the entire case and the intricacies in each one. The court in In re

Brian Wise Trucking, Inc., explained as follows:

> Some reorganizations might be relatively simple, requiring nothing more than restructuring debts to creditors in order to overcome temporary cash flow problems. Others will be more complicated and can involve identifying and closing down unprofitable lines of business, in order to focus on more profitable operations, renegotiating contracts, seeking third party financing, and negotiating with large numbers of creditors. Thus, depending upon the debtor and what it needs to do in order to reorganize its affairs, a successful reorganization can, quite reasonably, be a matter of only a few months, or several years, or anywhere in between. In other words, as much as one might like to be able to lay out precise road maps and timetables which say that by a particular point in time, a debtor must be able to demonstrate thus and so with a particular degree of precision, it is not possible to do so. Instead, what § 362(d)(2) calls for is much more of a discretionary inquiry, rather than a mechanical one, which, at bottom, requires the court to make a judgment call as to whether the debtor is making sufficient progress towards a sufficiently realistic goal such that its efforts should be allowed to continue.

In re Brian Wise Trucking, Inc., 386 B.R. 215, 219 (Bankr. N.D. Ind. 2008).

The following illustrative non-exhaustive list of factors are considered when analyzing

whether the second prong of 11 U.S.C. § 362(d)(2) has been met:

> 1. The debtor must be moving meaningfully to propose a plan;
> 2. The plan must provide that the lender's allowed secured claim would be valued and payable from the debtor's net operating income generated by its property or the ability to propose a plan based on the infusion of new capital, sale, or other viable means;
> 3. The plan must have a realistic chance of confirmation;

18

4. Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;

5. The reorganization must occur in a reasonable period of time. In this regard the factors to look at are:

      a. the negotiations among the parties;

      b. the amount of time that the debtor has been in possession and operating the business;

      c. the length of time since the expiration of the exclusivity period.

In re SW Boston Hotel Venture LLC, 449 B.R. 159, 179 (Bankr. D. Mass. 2011) (citing In re Building 62 Ltd. P'ship, 132 B.R. 219, 222 (Bankr. D. Mass. 1991)). During the exclusivity period the burden of proof may require a lesser standard as the case is starting out, but when the relief of stay is requested near the end of the exclusivity period or beyond the burden of proof requires a greater showing than merely plausibility. Id. (citing In re Holly's, Inc., 140 B.R. 643, 702 (Bankr. W.D. Mich. 1992)).

We'll start by analyzing the list of factors cited above with the evidence presented at the final hearing to determine if Debtor showed that there is "a reasonable possibility of a successful reorganization within a reasonable time" as required by the statute. See, United Sav. Ass'n of Tex v. Timbers, 484 U.S. at 375.

    **1.  The debtor must be moving meaningfully to propose a plan**.

As of this date, Debtor has not proposed a disclosure statement or plan. The case was filed on October 21, 2024, with the exclusivity period set to expire on February 18, 2025.  At that time, Debtor requested an extension of the exclusivity period until May 19, 2025 (a 90-day extension).  This request has not been disposed of; however, during the final hearing on the Motion for Relief from Stay, Debtor argued that the plan of reorganization would be filed by the last week of March 2025 when the appraisal report is finished.

It has now been over five months since the filing of the bankruptcy petition.  The value of the Property has always been crucial for the confirmation of the plan to be proposed, which

explains Debtor's decision to wait until the appraisal report is finalized before filing the plan of reorganization. However, it is noteworthy that the application to employ appraiser was filed on February 19, 2025, which was four months after the bankruptcy filing and nineteen days after WM Capital's Motion for Relief from Stay was filed. And Dr. Santiago testified that Mr. Pacheco had only two weeks to prepare his report. The court finds it striking that a debtor that filed bankruptcy on the eve of foreclosure, after ten years of litigation with the creditor and stalled negotiations, with a president who testified that he viewed the bankruptcy filing as a last opportunity to reorganize, has not proceeded more expeditiously after filing the bankruptcy petition.

Consequently, under these circumstances this court finds difficult to conclude that debtor is moving meaningfully to propose a plan.

2. **The plan must provide that the lender's allowed secured claim would be valued and payable from the debtor's net operating income generated by its property or the ability to propose a plan based on the infusion of new capital, sale, or other viable means.**

In this case, Debtor does not have substantial operating income as reflected in the Monthly Operating Reports filed. At the final hearing, Debtor's president stated that the plan will propose to pay the secured creditor in full, plus interest, through refinancing, an investor and/or the sale of the apartments. However, no evidence was presented to demonstrate that Debtor is actively pursuing any of these alternatives. The list of potential purchasers was not presented, nor evidence to suggest that any apartment has been sold since 2009, nor any documentation such as a letter of credit, nor any document or testimony of interested parties in purchasing the project as stated by Dr. Santiago. The docket of the case does not show an application to retain a realtor or a notary public. However, as support for his assertion that creditors will be paid in full plus interest, Debtor's president testified that the properties owned

20

by the related debtor entities are worth significantly more than what the letter of value provides, that is, $54,550,000, and that the plan will provide to sell the apartments in a one-to-three-year span. In contrast, Dr. Santiago also stated that the offer made to WM Capital of $25 million as payment for their $49 million claim was reasonable.

Regarding the aggregate value of the "as is" 205 apartments, estimated at $41 million, a simple calculation suggests that each apartment can be sold for $200,000. WM Capital's rebuttal expert witness, Mr. Jimenez agreed that there is a high demand in Puerto Rico for residential units priced around $200,000 and conceded that it is reasonable to believe the apartments could be sold at that price range. However, he explained that to perform a subdivision analysis, the value of the total sales of the individual units would need to be discounted by subtracting every component and considering the timeframe for these sales, and that while there is a market for apartments in that price range there are associated costs related to their sale that were not considered. Mr. Jimenez elaborated on the necessary discounts to determine a potential aggregate value for individual sales of the apartment units. He cited factors such as broker commissions, legal fees for sales, investment in the reconditioning of units in poor, fair, or "shell" condition, and holding costs like payroll, maintenance, and homeowners' association fees. Mr. Jimenez acknowledged that it is possible to estimate the discounts associated with the potential aggregate value of the individual sales of the apartment units, but he admitted that he did not know whether such estimates had been made.

Debtor's Exhibit 1 is a letter of value that does not meet the minimum requirements for an appraisal report under the Uniform Standards of Professional Appraisal Practice (USPAP) as Mr. Jimenez stated. He explained that the letter of value lacks the underlying documents and analyses necessary to support a credible valuation conclusion. Consequently, it remains unclear how Mr. Pacheco arrived at the conclusion that all apartments can be sold for a net profit of

$200,000 which considering the costs involved the sales price could be substantially more than $200,000 each.  Debtor's Exhibit 2 shows that an apartment was sold in January of 2009 for $202,000. This sale however, occurred sixteen years ago thus, the value of every residential apartment owned by Golden Triangle in 2025 cannot be based on the sales price of a single unit in 2009. While it can be safely concluded that the real estate value of the area has appreciated in the last sixteen years, there was testimony that the building had deteriorated, and that the apartments were not all in good condition, therefore with the information provided it is impossible to validate that the aggregate value of these apartments is in fact $41 million.

In sum, with the information provided this court may not conclude that the plan will provide that the lender's allowed claim will be paid with the sale of the apartments or by any other means.

### 3. The plan must have a realistic chance of confirmation.

WM Capital has stated repeatedly that it will not vote to accept any plan of reorganization proposed by Debtor. WM Capital is practically the only creditor in this case. At this point and without having seen the plan of reorganization it would seem that Debtor will need WM Capital's acceptance of the plan for it to be confirmed. The court, however, acknowledges that the deadline for filing proof of claims of governmental entities has not expired.

When the court asked how Debtor intends to overcome this crucial hurdle, it stated that WM Capital will be paid in full plus interest in a one-to-three-year span, which would render WM Capital unimpaired and, thus, without the right to vote on the plan.  The Bankruptcy Code in its section 1124 provides that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim

22

or interest". 11 U.S.C. § 1124. For instance, "[m]aking deferred payments on terms different from the original contract, or stretching payment beyond the maturity of its original contract, all constitute impairment of the claim." In re S-Tek 1, LLC, 2021 Bankr. LEXIS 3358, *7 (Bankr. D.N.M. Dec. 9, 2021). Thus, a payment plan of one to three years, plus interest, alters the legal rights of WM Capital under the state court judgment and does not make it unimpaired. This means that WM Capital will retain its right to vote. Contrary to Debtor's assertion, for WM Capital to be considered unimpaired, its judgment claim must be paid in full on the effective date of the plan which was never raised as an alternative.

4.      **Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;**

As stated above, the plan of reorganization has not been filed.

5.      **The reorganization must occur in a reasonable period of time. In this regard the factors to look at are:**

        **a. the negotiations among the parties;**
        **b. the amount of time that the debtor has been in possession and operating the business;**
        **c. the length of time since the expiration of the exclusivity period.**

No indication was given that there is ongoing negotiation between the parties. WM Capital was categorical in that it will not accept any proposed plan of reorganization. The offer made in October 2024 of $25 million was rejected.

Moreover, the testimony presented revealed that the parties have been in litigation for ten years, during which Debtor has been unable to develop the project as originally conceived, and no payment has been made to WM Capital. The reasons for this stagnation remain unclear. But as far as the bankruptcy case is concerned, any prospect of a reorganization will require outside investors and/or cash which Debtor has not shown it has because the properties owned by the related entities need repairs and selling the apartment will incur costs.

23

Debtor failed to present credible evidence on the feasibility of a plan of reorganization, that Debtor will, in fact, be able to generate enough income to pay WM Capital in full, plus interest, within the next three years as Dr. Santiago posited. And with the evidence presented this court is unable to conclude that a reorganization can occur within a reasonable period of time, or that it is even possible.

Before concluding it is important to point out that Debtor argued that the lifting of the stay would prejudice Debtor and its creditors. Debtor has essentially only one creditor, WM Capital, and it is requesting the lifting of the stay.

## IV. CONCLUSION

In view of the foregoing reasons, the court grants the Motion for Relief from Stay (Dkt. # 41) in favor of WM Capital.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of March 2025.

María de los Ángeles González
United States Bankruptcy Judge